# 18-3176-pr

## In The United States Court of Appeals
## For The Second Circuit

---

### Harry Vega, *Plaintiff-Appellee*

**Michael Cruz, Kenya Brown, Jeffrey Perry, Lee Grenier, Tavorus Fluker, Anthony Rogers, Thomas Marra, Terrence Easton, Lamont Samuel, Ian Cooke, J. Michael Farren, Lawrence Townsend and John Bosse: On behalf of themselves and all others similarly situated,** *Consolidated-Plaintiffs-Appellees*

### v.

**Scott Semple, Commissioner of Correction, James Dzurenda, former Commissioner of Corrections, Lee Arnone, former Commissioner of Correction, Theresa Lantz, former Commissioner of Corrections, James Armstrong, former Commissioner of Corrections, Henry Falcone, Warden, Garner Correctional Institution, Steven Link, Director, Department of Correction Engineering and Facilities Management, David Batten, former Director, Department of Correction Engineering and Facilities Management and John Does 1-3: All in their individual and official capacities,** *Defendants-Appellants*

---

ON APPEAL FROM THE DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT  (Arterton, J.)

---

### BRIEF OF PLAINTIFFS-APPELLEES

---

Martin Minnella, Esq.
Federal Bar No. ct01931
Minnella, Tramuta & Edwards, LLC
40 Middlebury Road
Middlebury, Connecticut

Telephone: (203) 573-1411
Fax: (203) 757-9313
Email: JohannaS@mtelawfirm.com

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS i

TABLE OF AUTHORITIES ii

RESTATEMENT OF THE ISSUES 1

STATEMENT OF THE CASE 1

District Court Decision Relevant to Appeal 15

SUMMARY OF ARGUMENT 19

ARGUMENT 21

Applicable Standard of Review 21

I. Given that Congress, in 1988, recognized the toxicity of radon, 22
which is the second leading cause of lung cancer even exceeding
environmental tobacco smoke, the district court properly denied qualified
immunity to defendants in their individual capacity because exposing
inmates to high levels of indoor radon gas far in excess of any published
safe levels constitutes deliberate indifference to conditions of confinement
posing an unreasonable risk of serious damage to inmate health in violation
of their constitutional rights under the Eighth Amendment.

A. Individual-capacity Defendants are not shielded by qualified 22
immunity.

*Eighth Amendment -- Conditions of Confinement* 23

*Qualified Immunity* 25

*The district court did not define the constitutional right too broadly.* 26

*Helling and LaBounty counsel that the district court properly denied* 30
*qualified immunity to defendants because radon is a comparable*
*toxic substance, the exposure to which violates the Eighth Amendment*
*conditions of confinement after June 18, 1993, the date Helling was decided.*

II.     The district court dismissed all pre-Helling conditions     38
of confinement claims.

III.    Because plaintiffs seek prospective, injunctive relief, Eleventh     38
Amendment sovereign immunity does not bar the official-capacity
claims.

CONCLUSION AND RELIEF SOUGHT     42

CERTIFICATIONS     45

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Creighton*, 483 U.S. 635 (1987) — 23, 26

*Anderson v. County of Kern*, 45 F.3d 1310 (9th Cir. 1995) — 25

*Anderson v. Recore*, 317 F.3d 194 (2d Cir. 2003) — 22

*Antares Aircraft, L.P. v. F. of Nigeria*, 948 F.2d 90 (2d Cir.1991) — 9

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) — 25, 26

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) — 21

*Barnes v. Furman*, 629 Fed.Appx. 52,
(2d Cir. 2015)(summary order), — 32

*Benzman v. Whitman*, 523 F.3d 119 (2d. Cir. 2008) — 22

*Braham v. Perelmuter*, Civil 3:15-cv-1094 (JCH) — 11

*Burns v. Martuscello*, 890 F.3d 77 (2d. Cir. 2018) — 15, 19, 31

*Canady v. Correct Care Sols.*, No. 15-CV-4893
(KMK), 2017 WL 4280552 (S.D.N.Y. Sept. 25, 2017) — 2

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir.1998) — 42

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) — 3

*City of Escondido, Cal. v. Emmons*, ___ U.S. ___,
139 S. Ct. 500 (2019) — 26

*City of Shelton v. Hughes*, 578 Fed.Appx. 53
(2d Cir. 2014) (summary order) — 39

|  | Page(s) |
|---|---|
| *Davis v. Scott*, 157 F.3d 1003 (5 th Cir. 1998) | 24 |
| *District of Columbia v. Wesby*, ___ U.S. ___,<br>138 S. Ct. 577, 590 (2018) | 26 |
| *Downing v. W. Haven Bd. of Ed.*, 162 F.Supp.2d 19<br>(D. Conn. 2001) | 8 |
| *Eberhardt v. O'Malley*, 17 F.3d 1023 (7th Cir. 1994) | 29 |
| *Edelman v. Jordan*, 415 U.S. 651 (1974) | 18, 39 |
| *Edwards v. Arnone*, 613 Fed.Appx. 44<br>(2d Cir. 2015)(summary order). | 31 |
| *Environmental Encapsulating Corp. v. City of New York*,<br>855 F.2d 48 (2d Cir.1988) | 34, 35 |
| *Estelle v. Gamble*, 429 U.S. 97 (1976) | 11, 15, 18, 19<br>21, 30, 35, 43 |
| *Ex parte Young*, 209 U.S. 123 (1908) | 20, 38, 39 |
| *Farmer v. Brennan*, 511 U.S. 825 (1994) | 24 |
| *Garcia v. Does*, 779 F.3d 84 (2d Cir. 2015) | 29 |
| *Gibbs v. Cross*, 160 F.3d 962 (3d Cir. 1998) | 42 |
| *Gibson v. County of Washoe*, 290 F.3d 1175<br>(9th Cir. 2002) | 24 |
| *Grice v. McVeigh*, 873 F.3d 162 (2d Cir. 2017) | 27 |
| *Hafer v. Melo*, 502 U.S. 21 (1991) | 22 |
| *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) | 23, 25 |

Page(s)

*Harper v. Showers*, 174 F.3d 716 (5th Cir. 1999)     23

*Harrison v. Barkley*, 219 F.3d 132 (2d Cir. 2000)     11, 12

*Hayes v. New York City Department of Corrections*,     44
    84 F.3d 614 (2d Cir. 1996)

*Helling v. McKinney*, 509 U.S. 25 (1993)     7, 15, 16, 19
    28, 30, 31,
    34, 42

*Herman v. Holiday*, 238 F.3d 660 (5th Cir. 2001)     24

*Hope v. Pelzer*, 536 U.S. 730 (2002)     29

*In re Dairy Mart Convenience Stores, Inc.*,     39
    411 F.3d 367 (2d Cir 2005)

*In re Deposit Ins. Agency*, 482 F.3d 612 (2d Cir.2007)     38

*Jaghory v. New York State Dep't of Educ.*,     21
    131 F.3d 326 (2d Cir. 1997)

*Johnson v. Lewis*, 217 F.3d 726 (9th Cir. 2000)     23

*Johnson v Newburgh Enlarged Sch. Dist.*,     23, 29
    239 F.3d 246 (2nd Cir. 2001)

*K. H. v. Morgan, 914 F.2d 846*, 851 (7th Cir.1990)     28

*Labatad v. Corrections Corp. of America*,     24
    714 F.3d 1155 (9th Cir. 2013)

*LaBounty v. Coughlin*, 137 F.3d 68 (2d Cir.1998)     15, 19, 28,
    30, 31, 32,
    34, 35, 42,
    43

|  | Page(s) |
|---|---|
| *Langley v. Coughlin*, 888 F.2d 252 (2d Cir.1989) | 41 |
| *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) | 3 |
| *Malley v. Briggs*, 475 U.S. 335, 341 (1986) | 25 |
| *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1992) | 42 |
| *McPherson v. Coombe*, 174 F.3d 276 (2d Cir. 1999) | 44 |
| *Morgan v. Morgensen*, 465 F.3d 1041 (9th Cir. 2006) | 23 |
| *Mullenix v. Luna*, ___U.S. ___, 136 S.Ct. 305 193 L.Ed.2d 255 (2015) | 26 |
| *Mulligan v. Rioux*, 229 Conn. 716 (1994) | 8 |
| *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415 (2d Cir. 2009) | 29 |
| *Pack v. Artuz*, 348 F.Supp.2d 63 (S.D.N.Y. 2004) | 44 |
| *Pearson v. Callahan*, 555 U.S. 223 (2009) | 26 |
| *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) | 17, 18, 20 |
| *Plumhoff v. Rickard*, 134 S.Ct. 2012 (2014) | 26, 28 |
| *Reichle v. Howards*, 566 U.S. 658 (2012) | 25, 26 |
| *Robinson v. Solano County*, 218 F.3d 1030 (9th Cir. 2000) | 29 |
| *Safford Unified School District No. 1 v. Redding*, 557 U.S. 364 (2009). | 29 |
| *Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006) | 37 |

*Saucier v. Katz*, 533 U.S. 194 (2001)                                              27

*State Employees Bargaining Agent Coalition v. Rowland,*                    9, 38, 39
    494 F.3d 71 (2d Cir. 2007)

*Sweet v Sheahan*, 235 F.3d 80 (Cir. 2000)                                          22

*Tanvir v. Tanzin*, 894 F.3d 449 (2d Cir. 2018)                                     8

*T.E. Industries, Inc. v. Safety Light Corporation,*                                40
    546 A.2d 570 (N.J. Super.A.D. 1988)

*Tellier v. Fields*, 280 F.3d 69 (2d Cir. 2000)                                     30

*United States v. Thorn I*, 317 F.3d 107 (2d Cir. 2003)                             34

*United States v. Thorn II*, 446 F.3d 378 (2nd Cir. 2006)                           34

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.,*                                  39
    535 U.S. 635 (2002)

*Warren, Benton, and Murray v. Keane, et al,*                                       43
    196 F.3d 330 (2d Cir. 1999)

*Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989)                        38

*Wilson v. Seiter*, 501 U.S. 294 (1991)                                             28, 44

*White v. Pauly*, __U.S.__, 137 S.Ct. 548, 552 (2017)                             26, 27, 28

*Woods v. Edwards*, 51 F.3d 577 (5th Cir. 1995)                                     23

*Ziglar v. Abbasi*, 582 U.S. __, __, 137 S.Ct. 1843, 1866 (2017)                   28

## Statute

42 U.S.C. § 1983                                                                    3, 22

|  | Page(s) |
|---|---|
| **Constitution** | |
| U.S. Const. amend. IV | 27 |
| U.S. Const. amend. VIII | 23, 24, 28 32, 34 |
| U.S. Const. amend. XI | 20, 38, 39 |
| **Rules** | |
| Fed. R. Civ. Pro. 12(b)(1); 12(b)(6) | 3, 21 |

# RESTATEMENT OF THE ISSUES

**I.**     Given that Congress, in 1988, recognized the toxicity of radon, which is the second leading cause of lung cancer even exceeding environmental tobacco smoke, did the district court properly deny qualified immunity to defendants in their individual capacity because exposing inmates to high levels of indoor radon gas far in excess of any published safe levels constitutes deliberate indifference to conditions of confinement posing an unreasonable risk of serious damage to inmate health in violation of their rights?

**II.**     No restatement.

**III.**     Because plaintiffs sought prospective injunctive relief, did the district court properly deny sovereign immunity to the official-capacity defendants under the Ex parte Young exception to the Eleventh Amendment?

# STATEMENT OF THE CASE

This is a class action filed[1] on behalf of all inmates, whether post-conviction or pre-trial detainees, exposed to levels of indoor radon gas far in excess of federal Environmental Protection Agency (EPA) and World Health Organization (WHO) standards while incarcerated at the Connecticut Department of Correction's ("DOC") Newtown facility, Garner Correctional Institution. ("Garner"). Plaintiffs

---

[1] By agreement during a telephone conference with the district court on July 24, 2017, it was agreed that defendants' motion to dismiss would be adjudicated prior to plaintiffs moving to certify their proposed classes.

contend that forcing inmates to be exposed involuntarily to indoor radon gas, a recognized human carcinogen, far in excess of any published safe level constitutes deliberate indifference by correctional officials to conditions of confinement posing an unreasonable risk of serious damage to an inmate's health in violation of their rights under the United States and Connecticut constitutions. (¶ ¶ 1, 41, 46).

In consideration that defendants' motion to dismiss on immunity grounds would be decided class certification, plaintiffs intentionally attached to their Amended Complaint a myriad of exhibits so that the district court (Arterton, J.) could consider these materials when determining whether defendants were entitled to qualified immunity. See, e.g., *Canady v. Correct Care Sols.*, No. 15-CV-4893 (KMK), 2017 WL 4280552, at *14 (S.D.N.Y. Sept. 25, 2017). (See, SA 007).

Having been alerted to high levels of indoor radon gas in the Garner school rooms and the need for wider facility follow-up testing, Defendants Dzurenda, Semple, Falcone, and Link intentionally chose not to test for radon in those areas where inmates were housed because the state Department of Public Health would have required that the inmates be notified of such testing in writing as it required that all Garner staff be so notified. (See Exhibit I attached to amended complaint at A-220). Plaintiffs' claim of deliberate indifference is further sharpened by the disparate treatment afforded Garner staff, including those then working at another DOC facility, whose exposure to unacceptable levels of radon gas were necessarily

2

substantively less than the 24/7 exposure of Garner inmates.[2] (¶ 146). Because any causally related medical condition to radon exposure may take many years to manifest itself as with asbestos, (¶ 6), Defendants Dzurenda, Semple and Falcone advised Garner staff to obtain a base-line chest x-ray and provided them with the opportunity to file a WC-207 package to protect their legal rights should staff members develop lung cancer or other chronic pulmonary condition from such elevated radon levels.(¶¶5, 7, 8, 9, 10, 145, 146, 154; A 160)). Given that the emergency installation of a radon mitigation system may not have remedied excessive indoor radon gas in those areas where Garner inmates are housed, radon testing in those areas must be done prospectively as well as the installation of any additional mitigation system deemed necessary. (¶ 46(A)).

Wholly ignoring the disparate treatment between Garner inmates and staff, (¶¶ 7 to 10, 145 to 147, 151 to 154), defendants moved to dismiss this consolidated action, seeking class certification, pursuant to Fed. R. Civ. Pro. 12(b)(6) and 12(b)

---

[2]"The Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985))."To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment[,] a plaintiff [usually] must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." Id. (citation omitted). Although plaintiffs do not claim that they are a protected class for purposes of the Equal Protection Clause of the Fourteenth Amendment, the markedly different treatment DOC afforded the Garner staff and inmates with respect to the future health risks from exposure to high levels of indoor radon the issue counsel that defendants have exhibited deliberate indifference to conditions of confinement.

(1), on the basis that they are immune from suit because qualified immunity bars the federal individual-capacity claims seeking money damages, and that Connecticut's Eleventh Amendment sovereign immunity bars the official-capacity claims and the equitable relief sought. Defendants additionally sought the district court decline to exercise supplemental jurisdiction over any remaining state-law claims.

The district court (Arterton, J.), at the start of oral argument, sought to narrow the issues by inquiring of the Assistant State Attorney General whether it was disputing that radon is a toxic substance. Despite Connecticut's own statutory authorities regulating radon as a toxic substance, Congressional identification of radon in 1988 as a human carcinogen added to the Toxic Substances Control Act, and DOC's own directive to those correctional and medical employees working at Garner that they could file a Workers' Compensation Notice of Claim for exposure to radon, these state defendants refused to take a position on radon's toxicity before the district court. (A-281).

Because defendants have failed to concede that radon is indeed a highly toxic substance, plaintiffs maintain defendants have substantively mischaracterized the nature of the claims brought by affirmatively ignoring material and uncontroverted facts. In its Amended Complaint, plaintiffs intentionally included :

> (1)   Abject and Purposeful Failure to inform Garner inmates of high levels of radon exposure and to provide community standard health

4

<u>screening for individuals exposed:</u>

Defendants *have **never** informed plaintiffs, nor any Garner inmate, past or present* that they were involuntarily exposed to high levels of indoor radon gas levels, a recognized human carcinogen, and the second leading cause of lung cancer as well as the leading environmental cause of lung cancer worldwide far in excess of any published safe level (¶61, 143). This failure is in sharp contrast to the actions of the Colorado Department of Correction when confronted with a comparable toxic exposure situation, high levels of uranium in the water supply in excess of the EPA standard at its Sterling correctional facility who provided notice and protective measures to staff and inmates alike. (¶ 162 and Exhibit J attached to amended complaint at A 225 et seq). Moreover, as part of its ongoing effort to cover up the high levels of radon exposure at Garner from the inmates housed there, DOC denied a putative class member, then housed at MacDougall Correctional Institution and thus with no easy mechanism to contact Garner inmates, access to particular pages of Prison Legal News that referenced radon exposure at Garner on the basis that such pages jeopardize a valid penological interest of "Safety and Security." (¶ 71 and Exhibit F attached to amended complaint at A 170 et seq).

Plaintiffs Grenier, Fluker, Rogers, Marra, Townsend, Easton, Samuel, Cooke and Farren first learned of his exposure to unacceptably high levels of indoor radon

gas through his prior legal counsel[3] and thereafter explored and agreed to be a named plaintiff in this class action complaint. During a telephonic conference, by agreement of the parties, the district court (Arterton, J.) consolidated plaintiff Vega's action with the Cruz complaint (3:17cv348) based on Vega's wholesale adoption of the Grenier complaint. Plaintiff Cruz, who has been diagnosed with lung cancer, and plaintiffs Brown, Perry and Bosse contacted undersigned counsel after learning of radon exposure through a newspaper article. Inmates cannot seek legal redress for unsafe conditions of confinement due to radon exposure and satisfy the grievance procedure exhaustion requirement *if they have no knowledge they were so exposed.* Because radon is colorless, tasteless and odorless, plaintiffs were necessarily dependent upon defendants to reveal high levels of radon exposure. (¶¶ 61-71).

(2)    Prospective relief requested

Plaintiffs' request for injunctive relief is not limited to past actions. Radon testing, even in large commercial-type buildings such as Garner, is typically

---

[3] Attorney Martin Minnella learned of the high levels of radon exposure at Garner and that inmates housed there had not been informed although DOC staff were told to get a base-line chest x-ray and afforded the opportunity to file a WC-207 form to ensure legal redress by way of workers' compensation benefits if he or she developed a medical condition such as lung cancer causally related to high levels of radon gas exposure while at work. Attorney Minella approached some inmates housed at Garner who were his former clients as is permissible under Rule 7.3 (a) (1) of the Professional Rules of Conduct to discuss this matter. Attorney Minnella thereafter, or in conjunction with co-counsel Stratton and Welch-Rubin, contacted certain other criminal defense lawyers who in turn contacted their former clients under Rule 7.3(a)(1) who agreed to serve as class members.

conducted in the basement and first floor areas because the gas seeps in from ground and then dissipates over time. The school rooms first tested, which DOC acknowledged was mandated testing, were located at Garner's second floor level and evidenced levels at or above the EPA action level of 4.0 pCi/L requiring additional testing. (Exhibit I attached to amended complaint at A 219 et seq). Given that Garner is physically located in an EPA action zone 1 – "highest potential (greater than 4.0 pCi/L), (¶ 93; A 186), and is a sealed building that does not use windows for ventilation, follow-up testing should have been widespread throughout the facility. Instead, because the state Department of Public Health required written notification of such radon testing to individuals in the areas subject to testing, (¶ 140; Exhibit I attached to amended complaint at A 220), defendants Semple, Dzurenda, Falcone , Link and Does 1-3,[4] purposefully decided not to test the cell block units so they would not have to notify the inmates housed at Garner of the radon testing results. (¶ 141).

In *Helling v. McKinney*, the Supreme Court held that the Eighth Amendment[5] protects prisoners from an official's deliberate indifference to

---

[4] Does 1 – 3 reference DOC engineering and/or maintenance employees involved in the air quality, radon testing, radon remediation systems installed and follow up testing and any necessary remediation. Despite the State's agreement in a telephonic conference with Judge Arterton after filing this appeal, the State had neglected and failed to supply plaintiffs with the list of all names encompassed by Does 1 – 3.

[5] For the purposes of this brief, plaintiffs will only address the federal constitutional claims. The district court did not address the state constitutional claims and made no decision on whether or

conditions posing an unreasonable risk of serious damage to the prisoner's future health. 509 U.S. 25, 33-35 (1993). (¶ 3). Pretrial detainees are afforded the same constitutional protection to be free from deprivations of liberty without due process of law pursuant to the Fourteenth Amendment. Plaintiffs seek prospective, injunctive relief first in the form of radon testing in all areas that house inmates to ensure that indoor radon gas levels are below the EPA action level and the installation of further mitigation systems if such testing so mandates. (¶¶ 46 (A), 49, 50, 166, 167).

Notably, defendants have provided no evidence that DOC has conducted radon testing in those extensive areas of the Garner facility housing inmates since the emergency installation of the remediation system completed in October 2014 that had never previously been tested to prove that the entire building has indeed been remediated. Such omission is telling given that "in adjudicating a motion to dismiss for lack of subject-matter jurisdiction, a district court may resolve disputed

---

not it would exercise its supplemental jurisdiction. Defendants never sought an articulation. More importantly, the federal qualified immunity defense is limited to claimed violations of federal law. *Downing v. W. Haven Bd. of Ed.*, 162 F.Supp.2d 19, 30 n.6 (D. Conn. 2001) (holding that federal qualified immunity defense did not apply to claims arising under the Connecticut Constitution because that defense "is limited to claimed violations of federal law, whether based on the federal constitution, federal statute, or federal treaties"); see *Mulligan v. Rioux*, 229 Conn. 716, 727-731 (1994) (discussing difference between federal qualified immunity doctrine and state common law immunity doctrines). This court should remand to the district court to make such determination in the first instance. See, *Tanvir v. Tanzin*, 894 F.3d 449, 472 (2d Cir. 2018).

factual issues by reference to evidence outside the pleadings, including affidavits. See, e.g., *Antares Aircraft, L.P. v. F. of Nigeria*, 948 F.2d 90, 96 (2d Cir.1991)." *State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 77 n. 4 (2d Cir. 2007).

Plaintiffs are all presently incarcerated by the State of Connecticut; DOC is thus necessarily charged with providing their healthcare, which in accordance with DOC policy is defined as consistent with the "community standard. " Scope of Health Services Care Directive 8.1 defines "community standard as "[t]he scope and quality of medical, dental and mental health services (including but not limited to diagnostic testing, preventive services and suitable after care, in terms of type, amount, frequency, level, setting and duration appropriate to the patient's diagnosis or condition) that is consistent with generally accepted practice parameters in the State of Connecticut as recognized by healthcare providers in the same or similar general specialty (as to typically treat or manage the diagnosis or condition, help restore or maintain the patient's health, prevent the deterioration or palliate the patient's condition, prevent the reasonably likely onset of a health problem, or detect an incipient problem). While plaintiffs concede that "not every lapse in prison medical care will rise to the level of a constitutional violation," see *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003), the community standard for a patient exposed to high levels of indoor radon gas includes a baseline chest x-ray or CAT

scan at his physician's determination based on past medical history, precisely the advice DOC gave to its staff at Garner.

Because medical conditions causally linked to radon including lung cancer can take many years to manifest themselves, the community standard includes medical monitoring as part of the annual physicals, again precisely the advice DOC gave to the Garner staff. (¶ 10). Such baseline chest x-ray or CAT scan and medical monitoring constitutes not only prospective relief, it represents an ongoing constitutional violation because Garner inmates are not receiving such community standard healthcare for high levels of radon exposure, nor are the vast majority of those exposed even knowledgeable that they should receive such community standard of health care because defendants purposefully, willfully and recklessly withheld from Garner inmates that they were exposed to high levels of a known carcinogen, in some cases the equivalent of smoking one to two and one-half packages of cigarettes.

Contrary to defendants' claim that baseline chest radiographic imaging and ongoing medical monitoring are simply the equivalent of future economic damages under Connecticut tort law, plaintiffs and putative class members still incarcerated are entirely dependent upon DOC to secure and provide their medical care. The Supreme Court has held that deliberate indifference by prison officials to a prisoner's serious medical needs constitutes cruel and unusual punishment in

violation of the Eighth Amendment. See *Estelle v. Gamble*, 429 U.S. 97, 104

(1976). If *Estelle* applies to an untreated tooth cavity, *Harrison v. Barkley*, 219

F.3d 132, 136-37 (2d Cir. 2000) (applying Estelle to claim of untreated tooth

cavity) and *Braham v. Perelmuter*, Civil 3:15-cv-1094 (JCH), then it surely applies

here where those plaintiffs not yet diagnosed with lung cancer are not receiving the

community standard of health care treatment when an individual is known to have

been exposed to high levels of radon, the leading environmental cause of lung

cancer in the United States and the second leading cause of lung cancer after

cigarette smoking.

Indeed, there is now pending before the Connecticut claims commissioner a

demand for legal redress brought by the widow of a retired, long term Garner

correctional officer who, had DOC informed him to obtain a baseline chest x-ray in

May 2014 when it informed then Garner staff at roll call, would have discovered

that he had lung cancer at a much earlier stage then when he finally discovered that

he had Stage 4, terminal lung cancer two years later. It is beyond dispute that early

detection matters in cancer treatment generally, and lung cancer treatment

specifically. Because time matters in the diagnosis and treatment of lung cancer, an

inmate's exposure to high levels of radon at Garner may not initially be serious,

but may become serious because medical conditions causally linked to radon

exposure can take many years to manifest themselves, can be degenerative and, if

left untreated or neglected for a long period of time, will "result in further significant injury or the unnecessary and wanton infliction of pain." See, *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) ("[B]ecause a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case under the Eighth Amendment").

On the eve of the scheduled oral argument, defendants sought leave to file supplemental authority, that is a newly amended directive adding a DOC policy on radon testing, adopted almost four years after the discovery of excessive radon exposure at Garner.[6] (A 236 – A 237). Given that defendants are claiming that there is no "clearly established right" with respect to the issue of radon testing in correctional facilities, they have now created a document that purports to set forth this clearly established right moving forward. Because there has yet to be any discovery in this matter, plaintiffs and the district court would have been blindsided by this Administrative Directive on radon testing that now expressly includes "inmate housing areas[,]" (Paragraph 7 b, p. 5; A 236 – A 237), had plaintiffs' counsel not anonymously received from a correctional officer a copy of the Garner Roll Call Notice dated June 4, 2018, the substance of which

---

[6] The district court first granted Defendants' Motion to file a supplemental authority (newly adopted DOC policy on radon) and thereafter granted Plaintiffs' motion (DOC Roll Call notice). DC ECF 64; 67.

stands in stark contrast to the newly adopted radon testing protocol.

Plaintiffs concede that the Garner Roll Call Notice predated the June 29th amended Administrative Directive on Life and Safety and thus the radon testing being conducted was not required to satisfy its mandates. It is however in those very areas that do not conform with the newly adopted radon protocol that makes the juxtaposition of these documents so close in time seminal to the issues that confronted the district court.

As the radon protocol properly provides at subsection (a)(ii), "[r]adon detection within facilities shall be conducted during the period ranging from November 1 through March 31." Such protocol reflects the reality that radon levels are lower in the summer. Moreover, greater concentrations of radon can enter the buildings during winter months because less radon in the soil is able to escape through the frozen ground thus the building pulls in higher concentrations of it. Closed building conditions during the winter also keep radon gas levels from being diluted by fresh air.

The June 4, 2018 Garner Roll Call Notice however indicates that radon testing will occur on June 13 through 15 as a continuation of the "Radon Remediation Project," the very time of the year when radon levels are at their lowest. Plaintiffs from the outset have submitted that the radon remediation installed in the fall of 2014 was insufficient for the entirety of this 245,000 square

foot facility because those housing areas with a 693 inmate capacity were never tested. The summer timing of this "hidden" radon testing, which includes drilling holes to check the air flow, strongly suggests that the radon levels in at least some parts of Garner are in excess of the EPA accepted level of 4.0 pi/Cl.

It is particularly distressing given the close proximity in timing of the newly established protocol for radon testing and the Garner Roll Call Notice date June 4, 2018 that once again defendants have failed to put the inmates housed at Garner on notice that the radon levels may well be in excess of acceptable limits, putting their health at risk from long term exposure to a known carcinogen. The Garner Roll Call Notice requires that it be read to the three daily shifts of correctional officers reporting for duty from June 5 to June 12, 2018 to ensure that all correctional officers have been notified as is required by the Department of Public Health Guidelines when radon testing is ongoing. Correctional officers will also have access to the results of this out of the ordinary radon testing in accordance with DPH policy. Once again, a deliberative decision has been made not to test those areas where the inmates are housed. The only inference to be drawn from this summer radon testing at Garner is that areas of the facility exceed the EPA action level of 4.0 pi/Cl. That defendants again failed to notify inmates of such radon testing, with this lawsuit pending, further counsels as to the wisdom of the district court decision and that this matter should proceed to discovery as to the

prospective relief sought.

**District Court Decision Relevant to Appeal:**

The district court (Arterton, J.) took notice, as confirmed at oral argument, that "Defendants do not claim in their Motion that the allegations regarding Plaintiffs' conditions of confinement could not amount to a constitutional violation, but rely on their contention that no authority clearly establishes that a supervisory correctional official can be found deliberately indifferent to inmate safety in the particular factual contexts alleged in this case." (SA 008). After acknowledging that courts "generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation whether conduct violated a clearly established right, . . ." the district court (Arterton, J.) opined that "the absence of a decision by this Court or the Supreme Court directly addressing the right at issue will not prevent a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Burns v. Martuscello,* 890 77, 94 (2d. Cir. 2018)(citations omitted). (SA-006).

Invoking the *Estelle, Helling* and *LaBounty* line of cases in denying qualified immunity as to plaintiffs' 8th Amendment conditions of confinement claim, the district court opined "[i]f anything, knowing or reckless exposure of prisoners to radon, given the facts alleged by Plaintiffs, is *more* obviously unconstitutional than exposure of prisoners to ETS was in 1993 . . . . [as radon ]

had already five years earlier been identified 'as a human carcinogen by the International Agency for Research on Cancer . . . and added by Congress that same year to the Toxic Substance Control Act.' (Am Compl. ¶ 57.)" (SA 011-12). It further noted that "[d]efendants here advance no argument that anyone – today or at the time *Helling* was decided – would voluntarily expose themselves to the levels of radon concentration that Plaintiffs allege." (SA 012). "Given substantially similar cases involving ETS and asbestos," Defendants' argument on qualified immunity grounds "fails at least from the date of *Helling.* (June 18, 1993)." (SA 014).

With respect to sovereign immunity, the district court first found an ongoing violation, "at very least *current* Garner inmates are still be subjected to an unreasonable risk of radon exposure." (SA 022). Refusing to dismiss official capacity claims despite acknowledging that some proposed class members, including those no longer in DOC custody, may no longer suffer an alleged ongoing violation, the district court opined that "if a class were to be certified, an injunctive relief class would have to be limited to members who actually face ongoing rather than solely past violations." (Id). The district court finally noted that "[t]he question of how to conceptualize class members no longer at Garner but still in DOC custody will be properly addressed in the context of a future motion for class certification, but not dispositive to the outcome of the instant Motion to

Dismiss." (Id).

As to the issue of prospective relief, the district court found that "the facts alleged in Plaintiffs' Amended Complaint, the long history of alleged cover up and failure to remediate radon, and the specific allegations involving the failure to test housing blocks at Garner" counsel that "Plaintiffs' allegations that they face an ongoing risk of unreasonably dangerous exposure to radon are not merely speculative." (SA 023). Noting that the defendants cited no authority for such proposition, the district court rejected "Defendants' suggestion in the motion to dismiss context, where a proposed class has not yet been certified, the fact that sovereign immunity may bar injunctive relief as to a majority of proposed class members means that a proposed class action must be dismissed in its entirety." (SA 023-24). Finally, the district court found that the newly-announced DOC directive on radon testing "may contour Plaintiffs' claims for injunctive relief," but does not provide a basis for granting Defendants' Motion to Dismiss, particularly given that the result and impact of such directive remains for discovery. (SA 024).

With respect to Defendants' assertion that *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106 (1984) bars Plaintiffs' claims for injunctive relief because Plaintiffs seek an injunction from a federal court requiring state officials to comply with state law, the district court credited that Plaintiffs' assertion, made clear at oral argument, that Plaintiffs cited state standards merely as evidence that

helps inform the Eighth Amendment analysis and not as a mandate that they seek to enforce for injunctive relief. (SA 025). The district court then opined that "[w]hile any injunction issued in this case must comply with *Pennhurst*, Defendants have not shown that they are entitled to dismissal of Plaintiffs' claim for injunctive relief on this basis." (Id).

Rejecting Defendants' contention that the medical monitoring requested is simply money damages in disguise, the district court first noted that "Plaintiffs and putative class members still incarcerated are entirely dependent upon DOC to secure and provide their medical care . . . [citing] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)." (SA 020). The district court thereafter opined that "Plaintiffs are alleging deliberate indifference to their medical needs in violation of the Eighth Amendment, and therefore the requested medical injunctive relief simply requires Defendants to provide the care they are obligated to under the Constitution." (SA 024). Finally, acknowledging that the Supreme Court in *Edelman v. Jordan*, 415 U.S. 65, 653, 677-781 (1974) made no distinction between injunctive rather than declaratory relief, the district court opined that dismissal of Plaintiffs' claim for declaratory relief is unwarranted at this stage because Plaintiffs seek declaratory relief related to the alleged ongoing constitutional violation. (Id).

## SUMMARY OF ARGUMENT

Defendants have, with deliberate indifference, exposed these inmates to indoor radon gas, a known human carcinogen, at levels that greatly exceed EPA's actionable radon limit of 4.0 pCi/L, posing an unreasonable risk of serious damage to their future health. Put differently, defendants have violated the right to be free from deliberate indifference to serious medical needs.

With respect to qualified immunity analysis, plaintiffs concede that courts generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation whether conduct violated a clearly established right. Contrary to the narrowly drawn approach counseled by defendants, "the absence of a decision by this Court or the Supreme Court directly addressing the right at issue will not prevent a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Burns v. Martuscello,* 890 77, 94 (2d. Cir. 2018)(citations omitted). The district court properly invoked the *Estelle, Helling* and *LaBounty* line of cases in denying qualified immunity as to plaintiffs' 8th Amendment conditions of confinement claim. Given radon's toxicity, plaintiffs concur with the district court finding that "[i]f anything, knowing or reckless exposure of prisoners to radon, given the facts alleged by Plaintiffs, is *more* obviously unconstitutional than exposure of prisoners to ETS was in 1993 . . . . [as radon ] had already five years earlier been identified

19

'as a human carcinogen by the International Agency for Research on Cancer . . . and added by Congress that same year to the Toxic Substance Control Act.' (Am Compl. ¶ 57.)" (SA 011-12).

As to the *Ex parte Young* exception to sovereign immunity under the Eleventh Amendment for prospective, injunctive relief, plaintiffs submit that the district court properly found that "the facts alleged in Plaintiffs' Amended Complaint, the long history of alleged cover up and failure to remediate radon, and the specific allegations involving the failure to test housing blocks at Garner" counsel that "Plaintiffs' allegations that they face an ongoing risk of unreasonably dangerous exposure to radon are not merely speculative." (SA 023). Moreover, the newly-announced DOC directive on radon testing "may contour Plaintiffs' claims for injunctive relief," but does not provide a basis for granting Defendants' Motion to Dismiss, particularly given that the result and impact of such directive remains for discovery. (SA 024).

With respect to Defendants' assertion that *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106 (1984) bars Plaintiffs' claims for injunctive relief because Plaintiffs seek an injunction from a federal court requiring state officials to comply with state law, the district court properly credited Plaintiffs' assertion, made clear at oral argument, that Plaintiffs cited state standards merely as evidence that helps inform the Eighth Amendment analysis and not as a mandate that they

seek to enforce for injunctive relief. (SA 025). "While any injunction issued in this case must comply with *Pennhurst*, Defendants have not shown that they are entitled to dismissal of Plaintiffs' claim for injunctive relief on this basis." (Id).

Defendants' contention that the medical monitoring requested is simply money damages in disguise must be rejected. Plaintiffs seek for this Court to similarly appreciate that "Plaintiffs and putative class members still incarcerated are entirely dependent upon DOC to secure and provide their medical care ... [citing] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)." (SA 020). As the district court opined, "Plaintiffs are alleging deliberate indifference to their medical needs in violation of the Eighth Amendment, and therefore the requested medical injunctive relief simply requires Defendants to provide the care they are obligated to under the Constitution." (SA 024).

## ARGUMENT

**Applicable Standard of Review:**

Appellate review of the district court's decision on a motion to dismiss under F.R.C.P. 12(b)(1) or 12(b)(6) is *de novo*. See, *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "In adjudicating a motion to dismiss based on

qualified immunity, 'the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense. . . . see, e.g., *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003).'" *Benzman v. Whitman*, 523 F.3d 119, 125 (2d. Cir. 2008). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

**I.      Given that Congress, in 1988, recognized the toxicity of radon, which is the second leading cause of lung cancer even exceeding environmental tobacco smoke, the district court properly denied qualified immunity to defendants in their individual capacity because exposing inmates to high levels of indoor radon gas far in excess of any published safe levels constitutes deliberate indifference to conditions of confinement posing an unreasonable risk of serious damage to inmate health in violation of their constitutional rights under the Eighth Amendment.**

**A.      Individual-capacity Defendants[7] are not shielded by qualified immunity.**

"Section 1983 authorizes civil suits for equitable relief and money damages against government officials acting under the color of government authority who subject individuals to 'deprivation[s] of any rights, privileges, or immunities secured by the Constitution and laws.' 42 U.S.C. § 1983. . . .The ability to sue for money damages under § 1983 serves both as an incentive for government agents to operate within the confines of their prescribed authority and as a remedy for

---

[7] *Hafer v. Melo*, 502 U.S. 21, 27-31(1991) (Eleventh Amendment does not bar damages actions against state officials sued in their personal or individual capacities).

22

vindicating federal civil rights. See *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) ('When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees."' (quoting Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982)))." *Johnson v Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001).

### Eighth Amendment -- Conditions of Confinement

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825 (1994); *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Thus, no matter where they are housed, prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted). "The Constitution does not mandate comfortable prisons ... but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) quoting *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995). Specifically, a prisoner must present evidence that the defendant's conduct resulted in the prisoner being incarcerated under "conditions which [posed] an unreasonable risk of damage to [the prisoner's] future health."

*Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001). This "risk must be of such a level that today's society would not tolerate it." Id.

To establish a violation of the Eighth Amendment, the prisoner must "show that the officials acted with deliberate indifference. . . ." *Labatad v. Corrections Corp. of America*, 714 F.3d 1155, 1160 (9th Cir. 2013) (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002). In order to prevail on an Eighth Amendment conditions of confinement claim, a plaintiff must satisfy a two-prong test: (1) objectively, the deprivations must be sufficiently serious; and (2) subjectively, the defendant must evince a "deliberate indifference" to the inmate's "health or safety." Id.; see also *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998). In order to show "deliberate indifference," an inmate must show that the defendant(s) knew of and disregarded a substantial risk of serious harm to his health. *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994). Further, the prisoner must show that the defendant(s)(1) were aware of facts from which an inference of excessive risk to the prisoner's health or safety could be drawn and (2) that he drew an inference that such potential for harm existed. Id

The deliberate indifference standard involves both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer* at 834. Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety." Id. at 837;

24

*Anderson v. County of Kern*, 45 F.3d 1310, 1313 (9th Cir. 1995).

## *Qualified Immunity*

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A clearly established right is one that is " sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). An official is entitled to qualified immunity unless (1) the facts alleged or shown by the plaintiff state a violation of a statutory or constitutional right by the official and (2) the right was "clearly established" at the time of the challenged conduct. See *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818). Put simply, qualified immunity protects " all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this action, defendants assert only the second basis-- that no clearly established right was violated--in arguing for qualified immunity. Under the second prong, a right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing

violates that right.'" *Ashcroft v. al- Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); See also *White v. Pauly*, __U.S.__, 137 S.Ct. 548, 552 (2017) (per curiam). There is no requirement that a case have been decided that is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, ___ U.S. ___, ___, 136 S.Ct. 305, 193 L.Ed.2d 255, 257 (2015). (citations omitted). A "broad general proposition" does not constitute a clearly established right. *Reichle v. Howards*, 566 U.S. 658, 132 S.Ct. 2088, 2094 (2012) (citation omitted). Rather, the constitutional right allegedly violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." Id. (quoting *Anderson*, 483 U.S. at 640). "[T]he crucial question [is] whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014).

**The district court did not define the constitutional right too broadly.**

Focusing primarily on recent Fourth Amendment cases emphasizing qualified immunity analysis requires a *high degree* of specificity, e.g. *City of Escondido, Cal. v. Emmons*, ___ U.S. ___, 139 S. Ct. 500, 503 (2019)("We have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment."); *District of Columbia v. Wesby*, ___ U.S. ___ 138 S. Ct. 577, 590 (2018)(partygoers failed to

26

identify a single precedent finding a Fourth Amendment violation under similar circumstances); *White v. Pauly*, ___ U.S. ___, 137 S.Ct. 548, 551-52 (2017); *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017)("[S]uch rights are only clearly established if a court can 'identify a case where an officer acting under similar circumstances' was held to have acted unconstitutionally."), defendants do not claim that plaintiffs' allegations on the conditions of confinement could not amount to a constitutional violation, but instead assert that no precedential authority clearly establishes that a supervisory correctional official can be found deliberately indifferent to inmate safety for radon exposure. Defendants contend that "[g]iven the specific and particularized aspects of radon and its detention, testing, remediation and other unique qualities, only a radon (prison) case from the Supreme Court or the Second Circuit can define the particularized conduct alleged with reasonable specificity." (SA 011). Such argument is mistaken for two distinct reasons.

First, requiring a high degree of specificity is especially important in the Fourth Amendment context, where both the Supreme Court and Second Circuit recognize that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). Probable cause "turn[s] on the assessment of probabilities in particular factual contexts" and

cannot be "reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213,

232 (1983). Given its imprecise nature, police officers will often find it difficult to

know how the general standard of probable cause applies in "the precise situation

encountered." *Ziglar v. Abbasi*, 582 U.S. __, __, 137 S.Ct. 1843, 1866 (2017).

Both the Supreme Court and the Second Circuit have stressed the need to "identify

a case where an officer acting under similar circumstances . . . was held to have

violated the Fourth Amendment." *White v. Pauly*, 580 U.S. __, __, 137 S.Ct. 548,

552 (2017) (per curiam ); e.g., *Plumhoff v. Rickard*, __ U.S. __, 134 S.Ct. 2012,

2023 (2014). Because Eighth Amendment qualified immunity analysis does not

turn on split second decisions police officers must make in the Fourth Amendment

context for which the Supreme Court and the Second Circuit have required the

identification of a prior case under similar circumstances, defendants have

overemphasized specificity and ignored applicable precedents involving exposing

prisoners to other toxic substances. See, *Helling,* and *LaBounty* discussed more

specifically below.

To be established clearly, however, there is no need that "the very action in

question [have] previously been held unlawful." *Wilson v. Layne*, 526 U.S. 603,

615 (1999). The unconstitutionality of outrageous conduct obviously will be

unconstitutional, this being the reason, as Judge Posner has said, that "[t]he easiest

cases don't even arise." *K. H. v. Morgan, 914 F.2d 846*, 851 (C.A.7 1990). But

even as to action less than an outrage, "officials can still be on notice that their conduct violates established law ... in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)." *Safford Unified School District No. 1 v. Redding*, 557 U.S. 364, 378-379 (2009).

Defendants' second error is thus to ignore long standing authority that "the absence of legal precedent addressing an identical factual scenario does not necessarily yield a conclusion that the law is not clearly established. See *Robinson v. Solano County*, 218 F.3d 1030, 1035 (9th Cir. 2000). Indeed, it stands to reason that in many instances 'the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with' the well-recognized applications of the right at issue on the part of government actors. *Eberhardt v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir. 1994)." *Johnson v Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2nd Cir. 2001).

"Although [this Court] generally look[s] to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right, the absence of a decision by this Court or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d

415, 433 (2d Cir. 2009); *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000) ) (internal

punctuation omitted)." *Burns v. Martuscello*, 890 F.3d 77, 94 (2d. Cir. 2018).

Contrary to defendants' claim, the *Estelle, Helling, LaBounty* line of cases plainly

foreshadow that exposing inmates to the substantial future health risks associated

with high levels of indoor radon gas is a clearly established right that the

defendants purposefully and intentionally violated by their disparate treatment of

the correctional staff, who were permitted to file workers' compensation claims for

future injuries associated exposure to high levels of indoor radon gas, and inmates,

who defendants once again fail to disclose that June 2018 radon testing portends a

continuing problem with the substantive medical risks associated with ongoing

exposure to high radon levels.

***Helling and LaBounty counsel that the district court properly denied qualified
immunity to defendants because radon is a comparable toxic substance, the
exposure to which violates the Eighth Amendment conditions of confinement
after June 18, 1993, the date Helling was decided.***

This court, like the district court, need look no further than *Helling v.*

*McKinney*, 509 U.S. 25 (1993)(ETS) and its progeny. Defendants' contention that

*Helling* is inapposite because it did not involve radon fundamentally

misunderstands its holding extending *Estelle* to future harm from an inmate's

involuntary exposure to toxic substances that society deems to violate the

contemporary standards of decency. Although prisoners who have lost their

liberty, Garner is their home. Plaintiffs here demonstrate that the risk from radon

exposure substantively in excess EPA action level of 4.0 pCi/l is not one that today's society choses to tolerate, particularly in the homes where they reside.

Defendants also claim that *Labounty v. Coughlin*, 137 F.3d 68 (2d Cir. 1998)(asbestos) is no longer good law: (1) in view of the prohibition in *Davis v. Scherer*, 468 U.S. 83, 194, 194 n.2 (1984) to use statutory or regulatory violations to demonstrate that a purported right is clearly established if plaintiffs are not suing directly under those statutes and (2) given recent Supreme Court and Second Court opinions requiring a high degree specificity in qualified immunity analysis. Again, defendants are misguided. First, plaintiffs' citations simply support the longstanding factual predicates proving radon is toxic as well as the extent of defendants' deliberate indifference, and thus do not run afoul of *Davis*. Moreover, plaintiffs find curious defendants' assertion that *LaBounty* is no longer good law given the outcome for Connecticut DOC defendants in *Edwards v. Arnone*, 613 Fed.Appx. 44 (2d Cir. 2015)(summary order). Connecticut's DOC defendants pressed the same argument made here, that, because, at the time of the defendants' actions, "there was no decisional law requiring that inmates in [Phase I of Administrative Segregation] exercise without handcuffs and leg restraints," they were entitled to qualified immunity. Rejecting such approach, this Court cited *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) with approval.("A right is 'clearly established' if 'the contours of the right are sufficiently clear that a

reasonable official would understand that what he is doing violates that right.'").
See also, *Barnes v. Furman*, 629 Fed.Appx. 52, 55 (2d Cir. 2015)(summary order),
citing *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) with approval.

When radon gas is inhaled, densely ionizing alpha particles emitted by
deposited short-lived decay products of radon (218Po and 214Po) can interact with
biological tissue in the lungs leading to DNA damage. Cancer is generally thought
to require the occurrence of at least one mutation, and proliferation of intermediate
cells that have sustained some degree of DNA damage can greatly increase the
pool of cells available for the development of cancer (Exhibit A attached to
amended complaint, World Health Organization Handbook on Indoor Radon,
2009; A 046 et seq). At issue in *Helling* was an inmate's exposure to
environmental tobacco smoke in the absence of a present physical injury. The
novel question presented was whether plaintiff could meet the deliberate
indifference standard by claiming that his exposure to ETS posed a likely risk of
future harm. The Supreme Court held an inmate must show he was "exposed to
unreasonably high levels" of environmental toxins. *Helling,* 509 U.S. at 35. To
violate the Eighth Amendment, the inmate must demonstrate the risk he complains
of is one that "society considers . . . so grave that it violates contemporary
standards of decency to expose anyone unwillingly to such risk." *Helling*, 509 U.S.
at 36. ("In other words, the prisoner must show that the risk of which he complains

is not one that today's society chooses to tolerate.").

Cognizant of the health hazards of environmental tobacco smoke, Connecticut Department of Corrections imposed a no-smoking policy at Garner Correctional Institution when it opened in November 1992 to ensure and promote the health of inmates and staff alike. Because indoor exposure to radon is recognized as the leading cause of lung cancer among non-smokers followed by exposure to environmental tobacco smoke and thus constitutes a risk that today's society chooses not to tolerate. (Exhibit B attached to amended complaint, CT Department of Public Health Basic Radon Facts, A 156 et seq). Like exposure to asbestos, any causally related medical condition may take many years to manifest itself. Connecticut Department of Corrections permitted its employees at Garner to file a workers' compensation claim for exposure to high levels of indoor radon gas, without any limitations on length of exposure, thus accepting liability to its employees for the health risks imposed by a third of the daily indoor radon exposure over a five day work week as compared to inmates housed at this facility 24 hours a day, 7 days a week). (Para, 7 ; Exhibit C attached to amended complaint, PRIDE newsletter 5/8/14 to 6/13/14, A 159). DAS Forms 207 submitted by Garner correctional and medical staff identify the "type of injury" and category or illness or injury as "exposure;" DAS Forms 207-1 submitted describe the "type of incident" as "Exposure: High levels of radon" and the "chain of

events" as "High levels of radon detected by CT Department of Public Health." (Exhibit D attached to amended complaint, A 160 et seq).

Because no one would willingly expose himself or herself radon levels in excess of acceptable EPA standards given it is a known human carcinogen, plaintiffs have demonstrated, as the district court found that the risks complained of here "violate contemporary standards of decency." *Helling*, 509 U.S. at 36. Given the serious toxicity of radon exposure that defendants themselves recognize for staff, but not their involuntary charges, the district court properly observed that "[i]f anything, knowing or reckless exposure of prisoners to radon, given the facts alleged by Plaintiffs, is *more* obviously unconstitutional than exposure of prisoners to ETS was in 1993[.]" (SA 011).

By analogy, this Court's analysis in *LaBounty v. Coughlin*, 137 F.3d 68 (2d. Cir. 1998) that the failure to protect an inmate from exposure to the health risks of friable asbestos[8] constitutes a viable Eighth Amendment claim remains both good law and instructive here. Prior to *LaBounty,* there was no Supreme Court case that established that an inmate's exposure to friable asbestos over an extended period

---

[8] Although in a different context, this Court found it "beyond peradventure that asbestos-related diseases, such as mesothelioma, asbestosis, and lung cancer, constitute serious bodily injury under the Guidelines." *United States v. Thorn I,* 317 F.3d 107, 118 n.7 (2d. Cir. 2003). Congress recognized the dangers of friable asbestos and identified it as a "hazardous air pollutant" in the early 1970s, and this Court has long acknowledged the attendant health risks. See *LaBounty v. Coughlin,* 137 F.3d 68, 74 n.5 (2d Cir. 1998) (citing *Envtl. Encapsulating Corp. v. City of New York,* 855 F.2d 48, 50 (2d Cir.1988))." *United States v. Thorn II,* 446 F.3d 378, 384 (2nd Cir. 2006).

constituted an Eighth Amendment violation. Reversing the district court's grant of qualified immunity, this Court held that "[g]iven the known dangers of friable asbestos in 1991-92 . . . a reasonable person would have understood that exposing an inmate to friable asbestos could violate the Eighth Amendment. Id., at 74. Noting that "[f]riable asbestos was recognized by Congress to be a dangerous toxic chemical in the early 1970s and was listed as a 'hazardous air pollutant' in the regulations to the Clean Air Act. 36 Fed.Reg. 5931 (1971)[,] [this Court] also acknowledged in 1988 that friable asbestos posed a significant health risk because airborne particles can become lodged in lungs and in the respiratory tract and over time can lead to asbestosis, mesothelioma and lung cancer. See *Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 50 (2d Cir.1988)." *LaBounty v. Coughlin*, 137 F.3d at 74 n. 5.

It is now undisputed that friable asbestos is a toxic substance and a known carcinogen. It is also now undisputed that inmates, when confined in conditions that expose them over a period of time to friable asbestos, have a cognizable Eighth Amendment claim because deliberate indifference to a prisoner's future serious medical needs constitutes cruel and unusual punishment as established by *Estelle v. Gamble*, 429 U.S. 97 (1976).

The case for the significant health risks of exposure over time to high levels of indoor radon is comparable. The substantive health risks associated with indoor

radon exposure are underscored by the fact that in 1988 Congress added Title III on Indoor Radon Abatement to the Toxic Substances Control Act. That same year, the Surgeon General of the United States warned that radon is the second leading cause of lung cancer in the United States and the leading cause of lung cancer in individuals who never smoked. According to the World Health Organization, lung cancer risk rises sixteen percent (16%) with every 2.7 pCi/L increase in radon exposure.

All major U.S. health organizations, such as the Centers for Disease Control and Prevention, the American Lung Association and the American Medical Association, concur with estimates that radon causes thousands of preventable lung cancer deaths each year.

Moreover, fifteen (15)[9] of the twenty one (21) state correctional facilities include a school established pursuant to DOC's Unified School District # 1. DOC's Student and Parent/Guardian Handbook, (A 187 et seq), states in relevant part with respect to Asbestos that "[legislation requires all school buildings to be reevaluated to determine if asbestos is present and if it poses a significant health hazard to the building's occupants. The Department of Correction meets or

---

[9] Fifteen DOC facilities have schools as part of Unified School District # 1: Bridgeport CC, Brooklyn CI, Cheshire CI, Corrigan-Radgowski CC, Enfield CI, Garner CI, Hartford CC, MacDougall CI, Manson Youth Institution, New Haven CC, Northern CI, Osborn CI, Robinson CI, Willard-Cybulski CI, York CI.

exceeds these OSHA standards." (A 195). Similarly, legislation requires that schools tests for radon since 2003 in Connecticut. Just as with asbestos, there is a clearly established right that radon not pose a significant health hazard to the occupants at Garner, inmates and staff alike, a clearly established right that precedes in time the newly adopted DOC radon testing protocol that went into effect ten days before this matter was originally scheduled for oral argument.

Plaintiffs further submit that defendants' deliberative decision to afford Garner staff not simply notice about the high radon levels to which they had been exposed while at work, but information about the health risks associated with such toxic exposure, affirmative advice as to the community standard of health care treatment for individuals exposed to high levels of radon and finally the ability to secure workers' compensation benefits for such exposure in the future should they develop a medical condition causally related to radon exposure while maintaining absolute silence with Garner inmates whose exposure was decidedly more substantial at 24/7 then a correctional officer or medical staff member satisfies the subjective prong, that the defendant prison official must have "act[ed] with a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (requiring, in context of subjective prong of deliberate indifference to medical needs claim, that "official act or fail to act while actually aware of a substantial risk that serious inmate harm will result").

## II.  The district court dismissed all pre-Helling conditions of confinement claims.

The plaintiff asserts that the district court opinion dismissed all pre-*Helling* conditions of confinement claims, including those asserted by pretrial detainees under the Fourteenth Amendment, alleged to have occurred before June 18, 1993, obviating the need for this Court to rule on Defendants' second claim of error.

## III.  Because plaintiffs seek prospective, injunctive relief, Eleventh Amendment sovereign immunity does not bar the official-capacity claims.

"The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It is well settled that the Eleventh Amendment to the United States Constitution generally bars suits brought by citizens against a state or a state official in federal court. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)Under the well-known exception to this rule first set forth in *Ex parte Young*, 209 U.S. 123 (1908), however, "a plaintiff may sue a state official acting in his official capacity-- notwithstanding the Eleventh Amendment--for prospective, injunctive relief from ongoing violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir.2007) (internal quotation marks omitted)." *State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d at 95 (affirming district court's denial of

motion to dismiss on sovereign immunity grounds because, although termination was a past state activity, fired state employees claiming improper discharge, seeking employment restoration and injunctive relief preventing retaliation for union activities constitutes prospective injunctive relief). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *City of Shelton v. Hughes*, 578 Fed.Appx. 53, 55 (2d Cir. 2014) (summary order).

Defendants assert plaintiffs have failed to meet the requirement of *Ex parte Young* that they allege an "ongoing violation of federal law." *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645(2002). Defendants maintain that the violations alleged here are not ongoing because the injunctive relief sought "is in practical effect indistinguishable in many aspects from an award of damages against the State." See, *Edelman v. Jordan*, 415 U.S. 651, 668 (1974). "Sovereign immunity bars suits whose direct outcome will diminish the public fisc through an award of retroactive damages." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 374 (2d Cir 2005)."

As with *State Employees Bargaining Agent Coalition*, "it is relevant-in considering the existence vel non of an ongoing violation-to ask whether the

claimed remedy is still available." Id. 494 F.3d at 96. It has been beyond

controversy since 1988 when Congress added Title III on Indoor Radon Abatement

to the Toxic Substances Control Act that "[t]o the extent, therefore, that

concentrations of radium and radon in a given environment approach the levels of

risk which have been scientifically and empirically verified, there is a danger to

human health." *T.E. Industries, Inc. v. Safety Light Corporation,* 546 A.2d 570,

572 (N.J. Super.A.D. 1988).[10] As was set forth with more specificity above,

defendants' abject failure to conduct radon testing in those areas where inmates are

housed at Garner in an effort to conceal this toxic problem from plaintiffs and

other Garner inmates, including after the installation of a remediation system

designed to alleviate excessive radon levels found in other areas of the facility,

makes this an ongoing violation as to the conditions of confinement.

Concededly, plaintiffs' complaint claims that the radon toxicity to which

Garner inmates were exposed was entirely preventable going back to when DOC

was in the planning stages for the facility that DOC was constructing in a physical

location known to have radon levels in excess of the EPA action level and

defendants thereafter had many opportunities over the years to discover and

remediate such toxic exposure, which they ignored, including defendants' failure,

beginning in 2003, to comply with its state statutory obligation to conduct radon

---

[10] See also, *T.E. Industries, Inc. v. Safety Light Corporation,* 587 A.2d 1249 (N.J. 1991).

testing at its school facility. (Radon as known carcinogen - ¶¶ 72 to 87; Garner Correctional Institution - ¶¶ 88 to 120; Impact of the presence of school at Garner - ¶¶ 121 to 138). Defendants seize on these past conduct allegations and engage in scare tactics by emphasizing the sheer size of a putative class in order to divert attention from plaintiffs' other prospective actionable claim as to deliberate indifference to ongoing medical care consistent with the community standard for those exposed to high levels of radon toxicity.[11] Again, as was set forth with specificity above, plaintiffs do allege that there is an ongoing violation that could be immediately cured by providing plaintiffs and other Garner inmates, who are entirely dependent upon defendants for their medical treatment, with a baseline chest-x-ray or CAT scan and ongoing medical monitoring. Plaintiffs are not seeking money but the medical treatment to which they are entitled as a matter of law and DOC policy.

"[T]he basic legal principle is clear and well established ... that when incarceration deprives a person of reasonably necessary medical care ... which would be available to him or her if not incarcerated, the prison authorities must provide such surrogate care." *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir.1989). Plaintiffs submit that their demand for prospective, injunctive relief

---

[11] Again, defendants have already altered plaintiff and the district court to the myriad of defenses, including statutes of limitations that they will assert should this matter not be dismissed outright

41

defined by a baseline medical examination, including a chest x-ray or CAT scan as warranted by individual medical history, and ongoing monitoring satisfies those factors that the Second Circuit has identified are "highly relevant" to the question of whether a medical condition is sufficiently serious, including: "an injury (exposure that increases the risk of lung cancer and other chronic pulmonary conditions) that a reasonable doctor or patient would find important and worthy of comment or treatment. . . ." *Chance v. Armstrong*, 143 F.3d at 702 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)).

## CONCLUSION AND RELIEF REQUESTED

"Inmates ought to be able to complain about 'unsafe, life-threatening condition[s] in their prison' without waiting for something to happen to them. After all, it is the prison administration, not the inmates, who are in the best position to determine the precise nature of any such contaminants in those situations where health hazards are not readily apparent to the unaided senses." *Gibbs v. Cross*, 160 F.3d 962, 965-66, (3rd Cir. 1998).

Exposure to high levels of radon gas poses a greater environmental risk for developing lung cancer and other chronic respiratory diseases than second hand smoke (ETS). As the Second Circuit noted,

> even before *Helling* was decided, plaintiffs possessed
> clearly established rights with respect to their health
> conditions. In *LaBounty*, a case involving the alleged
> exposure of prison inmates to asbestos, we held that the

> right at stake was not the narrow right to be free from
> exposure to asbestos, but a broader "right to be free from
> deliberate indifference to serious medical needs."
> LaBounty, 137 F.3d at 74. We noted that this right had
> been clearly established as far back as 1976 by *Estelle v.*
> *Gamble*, 429 U.S. 97, 104 (1976). See id. We determined
> that "[g]iven the known dangers of friable asbestos in
> 1991-92," a reasonable person would have known that
> exposure to asbestos could violate the Eighth
> Amendment. *LaBounty*, 137 F.3d at 74. Similarly, the
> medical dangers of ETS were well known to defendants;
> Sing Sing Policy and Procedure 104 itself states that "the
> health risks associated with smoking are well-
> documented." Given the known dangers of ETS, we
> conclude that a reasonable person would have understood
> that exposing an inmate to high levels of ETS could
> violate the Eighth Amendment.

*Warren, Benton, and Murray v. Keane, et al*, 196 F.3d 330, 333 (2d Cir. 1999).

Such analysis is equally applicable with respect to exposing an inmate to high

levels of indoor radon gas.

The prison administration defendants here have abdicated their

responsibility to protect inmates at Garner from exposure to the known carcinogen

radon.  That the defendants, with this lawsuit pending, once again failed to notify

the inmates at Garner as to the present risk of high radon exposure as evidenced by

the Garner Roll Call Notice dated June 4, 2018 disseminating the unusual

procedure of summer radon testing to correctional officers only counsels that the

defendants cannot prevail on the issue of qualified immunity at this preliminary

stage of the litigation.

Plaintiffs submit that the Garner Roll Call Notice dated June 4, 2018 represents ongoing evidence that that prison officials acted with "'a sufficiently culpable state of mind,' which the courts have defined as 'deliberate indifference' to an inmate's health or safety. See, *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999); *Hayes v. New York City Department of Corrections*, 84 F.3d 614, 620-21 (2d Cir. 1996)." *Pack v. Artuz*, 348 F.Supp.2d 63, 72 (S.D.N.Y. 2004). DOC's new policy directive on radon must be subjected to the scrutiny of the discovery process.

Plaintiffs thus respectfully request that this Court affirm the well-reasoned district court decision denying qualified immunity as of the date of *Helling* as well as denying sovereign immunity under the Eleventh Amendment as plaintiffs seek prospective, injunctive relief.

RESPECTFULLY SUBMITTED

Plaintiffs,

By /s/ Martin Minnella ct01931
Martin Minnella
Federal Bar No. ct01931
Minnella, Tramuta & Edwards, LLC
40 Middlebury Road
Middlebury, Connecticut
Telephone: (203) 573-1411
Fax: (203) 757-9313
E-mail: JohannaS@mtelawfirm.com

## CERTIFICATION OF COMPLIANCE WITH TYPE- VOLUME LIMIT, TYPEFACE REQUIREMENT AND TYPESTYLE REQUIREMENTS

I hereby certify that his brief complies with type-volume limitations Rule 32 (a)(7)(B) of the Federal Rules of Appellate Procedure, as modified by Local Rule 32.1(a)(4)in that brief, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) contains 10,861words.  I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) & (a)(6), as it has been prepared in Word 2007 using a proportioned spaced typeface, specifically 14-point Times New Roman font.

Dated: May 22, 2019.       /s/ Martin Minnella  ct01931
                           Martin J. Minnella
                           Attorney for Plaintiffs-Appellees

## CERTIFICATION OF SERVICE

I hereby certify that on this 22nd day of May, 2019, a copy of foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/EFC system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF System.

                           /s/ Martin Minnella  ct01931
                           Martin J. Minnella
                           Attorney for Plaintiffs-Appellees